IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EEMSO, INC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 3:05-CV-0897-P |
| | § | |
| COMPEX TECHNOLOGIES, INC. | § | |
| F/K/A REHABILICARE, INC., and | § | |
| IOMED, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant Iomed, Inc.'s ("Iomed" or "Defendant") Motion for

Summary Judgment, filed May 22, 2006. Plaintiff EEMSO, Inc. ("EEMSO" or "Plaintiff") filed

its response on June 23, 2006, and Defendant replied on July 25, 2006. For the reasons stated

below, the Court DENIES Defendant's Motion.[1]

### I. Background and Procedural History

This action arises out of a dispute over whether the product Plaintiff created and sought

to distribute qualifies as a trade secret under the law , and if so, whether Defendant improperly

obtained and used that trade secret to create its own product. EEMSO, a Texas corporation that

designs and sells medical devices, created the E-Strip, a disposable iontophoretic drug delivery

patch that uses an electric current to deliver medicine through a patient's skin. (Pl.'s Brief in

Opposition at 3.) The E-Strip was unique compared to other devices of its kind because it was

---

[1]Pursuant to Local Rule 7.1(g), Defendant's request for Oral Argument is DENIED.

self-contained; other drug delivery patches functioned such that a patient had to be connected to the device's power source by electrodes and wires, making mobility during treatment impossible. *Id.* Dan Shevlin, former president of EEMSO, developed the E-Strip in late 2000-2001 based on his observation of the IontoPatch®, a drug delivery device available on the market prior to the E-Strip's creation. (Def.'s Brief in Support at 3.) The IontoPatch® was also self-contained with a built-in power source; however, Shevlin noted that it did not receive sufficient power to effectively transmit medication. Therefore, Shevlin envisioned an EEMSO product that would be similar to the IontoPatch® in that it would be self-contained, but would utilize a different battery source– the button–cell battery. *Id.* By early summer 2002, EEMSO had produced working prototypes of the E-Strip and began the search for a distributor. (Pl.'s Brief in Opposition at 6.)

EEMSO contracted with Compex Technologies, Inc. ("Compex"), a distributor of medical supplies, to distribute the E-Strip. (Pl.'s Brief in Opposition at 3.) Compex and EEMSO entered a Confidentiality and Non-Disclosure Agreement ("CNDA" or "Agreement") in October 2002 that stated that Compex could not disclose confidential information concerning the E-Strip or EEMSO's related business plans. *Id.* The CNDA purported to be retroactive in that it made both prior and subsequent communication between EEMSO and Compex subject to non-disclosure. (Pl.'s Brief in Opposition at 6.) After Compex signed the CNDA, EEMSO provided confidential information including the EEMSO trade secret involved in the development of the E-Strip and its marketing strategies. *Id.* EEMSO claims that its trade secret is " a fully-integrated, self-contained iontophoretic device for delivering one or more drugs or other

therapeutic agents to user through skin." (Def.'s Brief in Support at 14.) EEMSO asserts that the trade secret is the "specific combinations and configurations" of elements used in the E-Strip, not the individual elements themselves. (Pl.'s Brief in Opposition at 4.)

EEMSO planned to sell the E-Strip to the new and untapped market of physicians as opposed to the usual market of physical therapists. *Id.* EEMSO's business strategy was based on the belief that the market for patch delivery devices was vibrant, but chiefly ignored by most of its competitors. *Id.* In fact, prior to May 2004 there had been no "single button-cell battery integrated iontophoretic patch on the market." *Id.* at 8.

Besides the distribution efforts being performed on EEMSO's behalf by Compex, EEMSO officials themselves were also testing the viability of the E-Strip in the relevant markets by disseminating samples to various individuals. (Def.'s Motion in Support at 3.) Bob Ricketts, Chairman of EEMSO's Board of Directors, distributed samples to two physicians, asking them to allow others of their colleagues to test them. (Pl.'s Brief in Opposition at 21.) In addition, EEMSO official David Wolf gave a sample to Gary Meier, an independent sales representative for Compex, prior to the signing of the CNDA. *Id.* None of these disclosures of the E-Strip were accompanied by a signed confidentiality agreement; however, EEMSO maintains that the disclosure to Meier is covered under the retroactive clause of the CNDA.

EEMSO alleges that the trade secret violation occurred on April 7, 2003. (Pl.'s Brief in Opposition at 3.) On that day, Compex officials attended a meeting with Iomed in which Iomed executives allegedly pressured Compex to reveal information about the E-Strip and its manufacture. *Id.* Compex allegedly gave Iomed the trade secret information, showed them a

*Memorandum Opinion and Order*
**No. 3:05-CV-0897-P**
**Page 3 of 20**

prototype of the E-Strip which executives handled and inspected, and divulged EEMSO's business plans. *Id.* EEMSO alleges that, based on the information it had received, Iomed surreptitiously obtained samples of the E-Strip and used it to develop the Companion 80, a competing patch delivery instrument strikingly similar to the E-Strip. *Id.* Subsequent to the Companion 80's production, Compex began distributing it on the condition that it would not distribute products of any Iomed competitor, which precluded it from continuing to distribute the E-Strip. *Id.* at 3–4.

Specifically, EEMSO alleges that the following events occurred after the April 2003 meeting:

•   On April 8, Iomed emailed its battery vendor Varta inquiring about the status of the prototype batteries.

•   On April 10, Iomed officials informed staff via email that Iomed was trying to obtain samples of EEMSO's E-Strip.

•   An April 23 staff meeting agenda indicates that Iomed officials asked staff if they had heard any information concerning the E-Strip.

•   On June 11, Iomed president, Bob Lollini, asked his assistant to try and obtain samples of the E-Strip so that Iomed could "look at how someone else addressed manufacturing." As a result, Administrative Assistant Pat Denning used her personal e-mail address and a fictitious business name to try and obtain the sample. In subsequent questioning, Lollini admitted that examination of how the EEMSO attached the button-cell battery to the E-Strip would be helpful in Iomed's development of the Companion 80.

•   An August 18 meeting agenda indicates that Compex and Iomed discussed EEMSO and the E-Strip as well as EEMSO's business strategy to sell the product in the untapped physicians' market.

•   In late August or early September, Roger Anderson emailed Iomed claiming to have obtained samples of the EEMSO strips.

- On September 25, Jon Beck, chief engineer for the Companion 80, analyzed the E-Strip measuring and photographing the internal detail.  Information from this analysis was subsequently distributed internally at Iomed.

- On October 3, Iomed asked vendor via email to make changes to the way the battery attached to the Companion 80.

- On October 10, Iomed began regular weekly meetings relating to the development of the Companion 80.

- In November, Iomed changed the design of the foam insulator used in the Companion 80, mimicking that used in the E-Strip.
  (Pl.'s Brief in Opposition at 9–11.)

As a result of these alleged actions, EEMSO has brought this action against Iomed for

Misappropriation of a Trade Secret, Intentional Interference with both an existing and

prospective Contract, Unfair Competition, Conversion, Conspiracy, and Constructive Trust.

In its defense, Iomed claims that it independently developed the Companion 80 before

the April 7, 2003 meeting and that the information EEMSO claims as a trade secret was well-

known and publicly available at the time of the meeting where the alleged trade secrets were

disclosed.  (Def.'s Motion for Summary Judgment at 1.)  Iomed claims that because E-Strip

developer Dan Shevlin was a newcomer to the field, he did not realize that he had brought

nothing new to the industry. (Def.'s Brief in Support at 2.)  Thus, the recognition Shevlin

surmised from his examination of the IontoPatch®—specifically that it needed a different power

source— was widely known in the industry and, more importantly, known by Iomed nine

months before the April meeting at issue in this case.  *Id.* at 3.  Iomed presents evidence that

every aspect of the Companion 80 design was in place before Iomed's first alleged exposure to

EEMSO's claimed trade secrets.  *Id.* at 9.  In support of this claim, Iomed alleges the following actions on the following dates:

- In September 1999, Iomed recognized that IontaPatch® was insufficiently powered and avoided a joint venture with its manufacturer as a result.

- On March 5, 2002, Iomed identified the development of a wearable patch as a priority project.

- A July 2002 drawing depicts the basic design for an "on-board battery,"particularly the button-cell battery,  in the patch; this design is the current design of the Companion 80. These drawings also depicted the present connection for the battery used in the device.

- On July 16, 2002, Iomed officially launched the development of the Companion 80.

- By October 2002, Iomed definitively settled on the button-cell battery for the Companion 80.

- On November 21, 2002, relevant documents listed the materials required to make the connections and insulate the device.  These materials are presently used in the Companion 80 and did not change after the April meeting.

- On December 18, 2002, Iomed communicated the desired connection to Varta.

- Patents issued concerning the connections and materials used in the Companion 80 on the following dates: 10/ 30/2002, 12/2/2002, 8/5/2002, 1/20/2003.  None of these patents issued to EEMSO.

- On January 22, 2001 Iomed was issued patent No. 6,731,977 for the "duletric layer of material" used in a product it issued in 1993 and presently uses in the Companion 80. (Def.s' Brief in Support at 9–13.)

Iomed additionally contends that EEMSO's dissemination of samples to third parties was for commercial gain and inconsistent with secrecy; thus, any trade secret  EEMSO may have had was forfeited by its failure to take reasonable precautions in securing the secrets.  (Def.'s Brief in Support at 27.)   Finally, Iomed claims that it could not have interfered with the CNDA because it had no knowledge of its existence, as Compex never disclosed the agreement to Iomed.

(Def.'s Motion for Summary Judgment at 1.)  For these reasons, Iomed asks this Court to enter summary judgment in its favor and asserts that all the other claims, Unfair Competition, Conversion, Conspiracy and Constructive Trust, fail because they are dependent upon the misappropriation claim.  *Id.*  However, EEMSO maintains that the E-Strip and Companion 80 are "similar beyond coincidence," and that its time line of evidence shows that the Companion 80 was developed through Iomed's improperly obtaining and using its trade secret. (Pl.'s Brief in Opposition at 27.)

## II.  Legal Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence.  *Celotex*, 477 U.S. at 323.  However, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  In addition, the court "may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact

issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). At this point, the nonmovant must provide specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248–50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

### III. Analysis

As stated above, Plaintiff raises the following claims against Defendant: Misappropriation of Trade Secret, Intentional Interference with a Contract, Conspiracy, Conversion, Unfair Competition, and Constructive Trust. The Court examines each claim below, finding that summary judgment is inappropriate for all of the claims.

### A. Misappropriation of Trade Secret

EEMSO first accuses Iomed of Misappropriation of Trade Secret. To establish trade secret misappropriation under Texas law, the plaintiff must show: (1) existence of a trade secret,

(2) breach of a confidential relationship or discovery of the trade secret by improper means, (3) use of the trade secret without authorization from the plaintiff, and (4) damages. *Lawfinders Assocs, Inc. v. Legal Research Ctr., Inc.,* 65 F. Supp. 2d 414, 417-18 (N.D. Tex 1999)(citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1123 (5th Cir. 1991)).  Use of the trade secret means commercial use, by which a person seeks to profit from the use of the secret. *Bancservices Group, Inc. v. Strunk & Associates, L.P.,* No. 14–03–00797–CV, 2005 WL 2674985, at *4 (Tex. App.–Houston [14th Dist.] Oct. 20, 2005, pet denied).  A person "misappropriates" a trade secret if he discloses it or uses it (a) in breach of a confidential relationship, or (b) after learning the trade secret from a third person with notice of the facts that it was a secret and that the third person's disclosure of it was otherwise a breach of duty to the other. *Id.*  Misappropriation does not require that he use it in exactly the form in which he received it; however, it must be substantially derived therefrom. *Id.*  The party claiming trade secret status bears the burden of proof of establishing that something is a trade secret. *Id.* at *3.

A trade secret is defined as any formula, pattern, device, or compilation of information used in a business, that gives the owner an opportunity to obtain an advantage over competitors who do not know or use it. *Lawfinders,* 65 F. Supp. 2d at 418 (citing *Phillips v. Frey,* 20 F.3d 623, 628 (5th Cir. 1994)).  To determine whether a trade secret exists, Texas courts apply a six-factor test: (1) the extent to which the information is known outside of [the claimant's] business; (2) the extent to which it is known by employees and others involved in [the claimant's] business; (3) the extent of the measures taken to guard the secrecy of the information, (4) the value of the information to [the claimant] and to his competitors; (5) the amount of effort or

money expended by [the claimant] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Bancservices,* 2005 WL 2674985, at *3 (citing *In re Bass,* 113 S.W.3d 735, 739 (Tex. 2003)).  "The party claiming a trade secret is not required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *Id.*  The status of information claimed as a trade secret must be determined through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct. *Id.*  Finally, to be protected a trade secret must give the owner a competitive advantage. *Lawfinders,* 65 F.Supp.2d at 418 (citing *Phillips v. Frey,* 20 F.3d 623, 628 (5th Cir. 1994)). Iomed asserts that its evidence conclusively rebuts EEMSO's misappropriation claim and that it is entitled to judgment as a matter of law.

## 1. *Were the Secrets EEMSO claims Part of the Public Domain?*

First, Iomed argues that EEMSO's product was in the public domain precluding any court or jury finding that a trade secret exists.  As proof, Iomed cites three patents issued prior to EEMSO's development of the E-Strip which Iomed maintains disclosed all elements of the E-Strip.  Texas law requires that a trade secret be a secret. *Lawfinders,* 65 F. Supp. 2d at 418 (citing *Zoecon Indus. v. Am. Stockman Tag Co.,* 713 F.2d 1174, 1179 (5th Cir. 1983)).  A trade secret can neither be generally known by others in the same business nor readily ascertainable by an independent investigation. *Id.*  However, in this case, EEMSO alleges that its trade secret is "specific combinations and configurations" of technologies that are in the public domain by way of the patents and the information known within the industry.  "[A] trade secret can exist in a

combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible secret." *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1202(5th Cir. 1986).  Consequently, EEMSO can still have a property right courts should protect in its unique combination of elements, even if they individually are in the public domain.  As a result, Iomed's evidence that all of the information used in the E-Strip was in the public domain prior to April 7, 2003 is not dispositive.  A fact issue exists whether EEMSO did in fact have a trade secret in its asserted unique combination and configuration of elements despite that the individual components of that trade secret may have been available in the public domain.

### 2. Did EEMSO Take Reasonable Steps to Maintain the Secrecy of its Trade Secret?

Aside from Iomed's argument that EEMSO's alleged trade secret was well-known in the industry and available in the public domain, Iomed additionally argues that EEMSO failed to take reasonable measures to protect the secrecy of the trade secret and thus invalidated the protection to which it otherwise may have been entitled.  Iomed argues that EEMSO's providing samples to the physicians, physical therapists, and representative from Compex prior to the CNDA vitiated the secrecy required for a trade secret.  "In order to be a 'trade secret,' there must be a substantial element of . . . secrecy and a party must take reasonable measures to protect the secrecy of its trade secrets.  *Bancservices,* 2005 WL 2674985, at *2.  Because a trade secret must be a secret, the owner of a trade secret must do something to protect itself. *Lawfinders,* 65 F. Supp.2d at 418 (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1123 (5th Cir.

1991)).  The owner of a trade secret will lose its trade secret by disclosure unless the secret is revealed in some manner by which the owner creates a duty and places that duty on the other party not to disclose further or use the trade secret in violation of that duty. *Lawfinders,* 65 F. Supp. 2d at 419 (citing *Taco Cabana,* 932 F.2d at 1123).

Iomed asserts and EEMSO admits that no agreements of confidentiality were signed with some of the third parties to whom EEMSO officials sent samples of the E-Strip.  Thus, Iomed argues that EEMSO has failed to take reasonable steps to insure the secrecy of its alleged trade secret.  However, under Texas law, secrecy does not have to be absolute and the mere fact of disclosure without a confidentiality agreement is not dispositive.  "In determining whether a confidential relationship exists, [a] court must examine the entire record." *Hollomon v. O.Mustad & Sons (USA), Inc.,* 196 F. Supp. 2d 450, 459 (E.D. Tex. 2002)(citing *Hyde Corp. v. Huffines,* 314 S.W.2d 763, 777 (Tex. 1958)).  An express contractual provision is not required to establish a duty of confidentiality; however, the absence of an agreement restricting disclosure of information is a factor the court may consider.  *Holloman,* 196 F. Supp. 2d at 459 (citing *Daily Int'l Sales Corp. v. Eastman Whipstock, Inc.,* 662 S.W.2d 60, 63 (Tex. App.—Houston [1st Dist.] 1983, no writ)).  Thus, courts may consider the nature and extent of security precautions taken to keep the information from the general public, and the degree to which the information has been placed in the public domain by voluntary disclosure, but these considerations are weighed in the context of the existing facts. *Holloman,* 196 F. Supp. 2d at 459 (citing *Kimes v. Club Corp. of Am.,* 542 S.W.2d 909, 913-14 (Tex. Civ. App.–Dallas 1976, writ ref'd n.r.e.)).  Therefore, any evidence EEMSO presents as to its efforts to keep the trade secret confidential is

to be weighed to determine if those efforts were reasonable, and the absence of a written agreement and even EEMSO's encouragement of the recipients of the samples to share them with others may constitute reasonableness in light of the entire record and relevant circumstances.   While public revelation would almost certainly eliminate secrecy, limited disclosure may be  acceptable in certain circumstances such as when an employer makes disclosures to employees involved in the use or manufacture of the trade secret. *Metallrgical,* 790 F. 2d at 1200.

"[A] holder may divulge his information to a limited extent without destroying its status as a trade secret." *Id.*  Thus, if disclosure is limited and communicated to further economic interests, then the requirement of secrecy is met. *Id.*  While the Fifth Circuit has stated that proof of a confidential relationship with the divulgees makes a stronger case for secrecy, it ultimately held that whether disclosure is limited is an issue dependent on weighing many facts. *Id.* EEMSO has presented evidence that its disclosures were limited and made only to those with whom officials had close relationships.  EEMSO also presents evidence that its disclosures were for the purpose of furthering its economic interests.  Consequently, a jury needs to decide whether the requisite confidentiality exists to find that EEMSO's E-Strip represents a trade secret.

### 3.  Was EEMSO's Trade Secret Sufficient to Give it an Advantage over Others?

In its final attack on EEMSO's claim of a trade secret, Iomed asserts that Dan Shevlin's modifications to the patch delivery device were not new or innovative and simply used already existing technology, specifically the IontoPatch®.  EEMSO concedes that the E-Strip is an

improvement on the IontoPatch®.  The Fifth Circuit has held that simple or obvious changes to existing devices are not trade secrets; however, an improvement that gives an advantage over competitors can be protected as a trade secret. *Sikes v. McGraw-Edison Co.,* 665 F.2d 731, 736 (5th Cir. 1982).  EEMSO can claim a trade secret for creating the "first successful [delivery patch] of its kind." *Id.* at 736.  "A trade secret may be a device or process which is patentable; but it need not be that." *K & G Oil Tool Serv., Co. v. G & G Fishing Tool Serv.,* 314 S.W.2d 782, 789 (Tex. 1958) (quoting 4 Restatement of the Law of Torts § 757 at 6.)  "It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement. . . ." *Id.*  "Novelty and invention are not essential for a trade secret as they are for patentability." *Id.*  Again, Iomed's assertion that the change to a button-cell battery as a  power source  is an obvious and simple modification is not dispositive, and a reasonable jury could find that EEMSO's improvement to the IontoPatch® design is a trade secret.  For these reasons, the Court finds that EEMSO has met its burden of producing evidence that raises a fact issue as to whether the E-Strip is a trade secret.

### 4.  Is there Sufficient Evidence to Support an Assertion that Iomed Improperly Obtained and Used the Trade Secret?

Iomed next states that the Court should grant summary judgment because EEMSO has no evidence to show that Iomed improperly obtained and used the E-Strip.  In support of this assertion, Iomed states that its plan drawings of the Companion 80 show its power source, the way it would be connected, and the material for insulation and accurately depict the Companion 80 in its final state.  These plans prove, according to Iomed, that the design of the Companion 80 did not change after the April 7 meeting, and that Iomed knew of EEMSO's alleged innovation

prior to that date.  Thus, Iomed asserts it has effectively negated the evidence EEMSO presents such that there is no fact issue as to this element.  However, the Court finds that Iomed has simply illuminated the fact issue.  While Iomed presents compelling evidence that it was attempting to develop the Companion 80 well before April 2003, this evidence is not dispositive. EEMSO presents equally compelling evidence which suggests Iomed may have improperly obtained the trade secret and used it to develop and market its own product.  This evidence ranges from a phone call to Varta about the battery on April 8, to emails and meetings where Iomed staff discussed the E-Strip, and most compellingly to photographs depicting an internal examination of the E-Strip and resulting similarities between the E-Strip and the Companion 80. EEMSO's evidence further suggests that Iomed may have made more than one significant change to the design of the Companion 80 subsequent to the April 7 meeting and after obtaining and examining an E-Strip.  Consequently, a genuine issue exists that must be resolved by a jury who has the benefit of weighing the credibility of the parties and their evidence—a task not appropriate for a judge at the summary judgment stage.  In short, EEMSO has created a fact issue as to whether IOMED improperly obtained and used EEMSO's alleged trade secrets and thus damaged EEMSO.  For all of the foregoing reasons, the Court DENIES Defendant Iomed's request for summary judgment in relation to the claim for Misappropriation of Trade Secret.

### B.  Intentional Interference with a Contract

EEMSO also brings claims for Intentional Interference with a Contract and Intentional Interference with a Prospective Contract.  In order to successfully bring a claim for tortious interference with an existing contract, a plaintiff must prove the following: (1) existence of a

contract subject to interference; (2) a willful and intentional act of interference; (3) that the act was a proximate cause of damage; and (4) actual damage or loss. *MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.,* 422 F. Supp. 2d 724, 740 (N.D. Tex. 2006)(citing *Flourine On Call Ltd. v. Flourogas Ltd.,* 380 F.3d 849, 864 (5th Cir. 2004)).   To bring a successful claim for interference with a prospective contract, a plaintiff must prove (1) the reasonable probability that plaintiff would have entered into a business relationship, (2) an independently tortious or unlawful act by the defendant that prevented relationship from occurring, (3) such act was performed with a conscious desire to prevent relationship from occurring or a knowledge of probable certainty that relationship would be prevented as a result, and (4) actual harm or damages suffered by plaintiff as a result of the interference. *Id.*   EEMSO argues that Iomed pressured Compex to reveal confidential information about the E-Strip at the April meeting and later pressured Compex to sell only Iomed products–specifically the competing Companion 80–and not sell the products of competitors.   These actions prevented Compex from distributing the E-Strip, for which EEMSO had bargained and contracted.   In short, EEMSO asserts that in pressuring Compex to divulge secret information, Iomed violated the CNDA and in insisting that Compex only sell the Companion 80, Iomed prevented the further distribution of the E-Strip by Compex.

Iomed counters that it could not interfere with a contract that it did not know existed.   To support its assertion Iomed states that Compex never disclosed the existence of the CNDA to it; therefore, EEMSO cannot meet the intent element of the interference claims.   However, Texas courts have held that an interfering party has the requisite knowledge to form intent if he has knowledge of facts and circumstances that would lead a reasonable person to believe that a

contract exists or if the interfering party is aware of the plaintiff's interest in it. *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 657 (Tex. App.—Corpus Christi 1991, writ denied).  To support its assertion that Iomed had knowledge of the existing contract and later the prospective one, EEMSO states that an Iomed executive admitted that he and a colleague in attendance at the April 7 meeting suspected that Compex was under a duty of confidentiality from the circumstances and facts as they appeared that day.  Consequently, the fact that the existence of the CNDA was not specifically disclosed to Iomed is not dispositive of whether there was knowledge of the contract; thus a genuine issue exists for a fact finder to determine whether Iomed had the requisite knowledge to interfere with a contract as EEMSO claims.

Iomed's primary argument against the interference claims, particularly the interference with a prospective contract claim, is that the claims are based on proof of misappropriation of trade secrets which Iomed asserts has failed.  However, because this Court has denied summary judgment for the misappropriation claim on which the interference claims rest, it must also deny summary judgment for the interference claims.  Thus, the Court DENIES Defendant's request for summary judgment on the claims of interference with a contract.

### C.  Conspiracy, Conversion, Unfair Competition, and Constructive Trust

EEMSO's remaining claims are also based on the underlying misappropriation of  trade secrets claim.  For this reason, Iomed asserts that the claims must fail as EEMSO has failed to raise facts that could support a finding that Iomed misappropriated the trade secrets.  However, the Court has found above that EEMSO has in fact produced enough evidence to avoid summary

judgment for this claim.  Thus, the remaining claims cannot be decided absent the decision of a fact finder.

To prove conspiracy, a plaintiff must show that (1) two or more persons conspired, (2) having an object to be accomplished, (3) there was a meeting of the minds on the object or course of action, (4) the conspirators committed one or more unlawful overt acts, and (5) damages occurred as a proximate result. *MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.,* 422 F. Supp. 2d 724, 741 (N.D. Tex. 2006).  While Iomed correctly argues that entering an exclusive distribution agreement, such as the one it has with Compex, is not illegal, it is the improper means of obtaining the trade secrets and the use of those that would be the independent tort that is the gravamen of the conspiracy claim.  Thus, the resolution of the misappropriation claim question could allow a jury to decide that Compex and Iomed were part of a conspiracy to damage EEMSO by improperly obtaining and using trade secrets.

Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the property of another to the exclusion of and inconsistently with the owner's rights. *Id.*  Here the trade secrets are the property, and a fact issue exists as to whether Iomed illegally obtained and then used them to the damage of EEMSO.  Thus, summary judgment is inappropriate.

Unfair Competition "acts as an umbrella for all statutory and non-statutory claims 'arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Id.* (quoting *Am. Heritage Life Ins. Co., v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir. 1974)).  "The tort of [unfair competition] requires that the plaintiff show an illegal act by the

defendant which interfered with the plaintiff's ability to conduct its business." *Decorative Ctr. of Houston v. Direct Response Publ'ns, Inc.,* 208 F. Supp. 2d 719, 735 (S.D. Tex. 2002)(quoting *Taylor Publ'g Co. v. Jostens Inc.,* 216 F.3d 465, 486 (5th Cir. 2000)).  Because the misappropriation claim (the underlying tort) has survived summary judgment, so too must the claim for unfair competition.

Finally, EEMSO brings a claim of Constructive Trust under which it claims that Iomed was unjustly enriched through the fraudulent breach of the CNDA by Compex and Iomed's subsequent misappropriation of EEMSO's trade secret.  Before a constructive trust can be imposed, there must be strict proof of a prior confidential relationship and unfair conduct or unjust enrichment on the part of the wrongdoer. *Hanblet v. Coveney,* 714 S.W.2d 126, 128 (Tex. App.—Houston [1st Dist] 1986, writ ref'd n.r.e.).  Further, a third party can be subject to a constructive trust if it is unjustly enriched by the fraudulent actions of a party who violates a confidential relationship. *Id.* at 130-31.   EEMSO has produced evidence that a confidential relationship existed between it and Compex pursuant to the CNDA prior to the April 7 meeting between Compex and Iomed.  EEMSO has further provided evidence that there were disclosures at the meeting in violation of the agreement that may have led to substantial changes in Iomed's product and in targeting a specific market.  Finally, EEMSO has presented facts that the Companion 80 is substantially similar to the E-Strip and has been released into the same market as the E-Strip bringing an economic advantage to Iomed.  Therefore, a reasonable jury could find that Iomed is a third party unjustly enriched by the breach of Compex.  In sum, because all the

remaining claims rest on the resolution of the misappropriation question, they survive summary judgment.

### IV.  Conclusion

For the foregoing reasons, the Court hereby DENIES Defendant's Motion for Summary Judgment as to all claims.

**It is so ordered.**

Signed this 31st day of August 2006.

_____

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE